(63 South. 480.)

No. 19,485.

O'ROURKE v. FULTON BAG & COTTON MILLS.

(June 30, 1913. On Application for Rehearing, Dec. 1, 1913.)

*(Syllabus by Editorial Staff.)*

1. LANDLORD AND TENANT (§ 125*)—IMPLIED WARRANTY—"FACTOR OF FIVE."

Where a city ordinance required the floors of all stores and warehouses to be calculated to carry 250 pounds, and all calculations for their strength to be with a "factor of five," which means that the floor must be five times stronger than necessary to carry the ordinary weight it is designed to carry, the lessee of a warehouse in such city had a right to assume, in the absence of anything to the contrary,

either said or written, that the floors complied with the ordinance, and the leasing of the warehouse amounted to a representation by the lessor that it did comply therewith.

[Ed. Note.—For other cases, see Landlord and Tenant, Cent. Dig. §§ 441–443; Dec. Dig. § 125.*]

2. LANDLORD AND TENANT (§ 125*)—NONDELIVERY OF POSSESSION—RIGHT TO DAMAGES.

Where, though under a lease, the lessee was entitled to a warehouse with floors capable of supporting 250 pounds with a factor of five to the square foot, the building was designed to support only 150 pounds with a factor of four, and the lessor procured an injunction forbidding the use of the building beyond this reduced weight, whereupon the lessee sued for a cancellation and for damages, and thereafter refused to pay rent, and the lessor then exercised its right to cancel the lease for nonpayment of the rent, the lessee was not precluded from recovering damages sustained by vacating the building and not having the continued enjoyment thereof, on the theory that they were caused by his own failure to pay the rent, since there was no sufficient delivery of the leased premises, and the lessee did not owe rent from the time he elected, by suing for a cancellation, not to accept the building as a compliance with the lease.

[Ed. Note.—For other cases, see Landlord and Tenant, Cent. Dig. §§ 441–443; Dec. Dig. § 125.*]

3. MUNICIPAL CORPORATIONS (§ 111*)—BUILDING ORDINANCES—CONSTRUCTION AND VALIDITY.

A city ordinance, requiring floors of warehouses to be calculated to carry a dead load of 250 pounds, was not obsolete or ineffective even though, as claimed, a "dead load" was the weight of the floors themselves, while the load put thereupon was a "live load," since this alleged defect could not have misled any one; it being evident that the weight to be put on the floors was the weight which they were to be calculated to carry.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 245–256; Dec. Dig. § 111.*]

4. LANDLORD AND TENANT (§ 125*)—DEFECTS IN LEASED PREMISES—RIGHT TO DAMAGES.

The carrying capacity of the floors of a warehouse was a matter for experts to determine, and a nonexpert lessee, though he visited and examined the warehouse before leasing it, was not thereby precluded from recovering damages because they did not have the carrying capacity required by a city ordinance.

[Ed. Note.—For other cases, see Landlord and Tenant, Cent. Dig. §§ 441–443; Dec. Dig. § 125.*]

5. LANDLORD AND TENANT (§ 125*)—ACTIONS FOR DAMAGES — EVIDENCE—ADMISSIBILITY.

In an action by the lessee of a warehouse for damages because the floors did not have a carrying capacity of 250 pounds to the square foot, as required by the lease, where damages for overloading the floors were not sought by the lessor and it was admitted that the floors did not have such carrying capacity, the only issue being as to whether the lease called for such capacity, evidence that the lessee loaded the floors beyond 250 pounds to the square foot was immaterial.

[Ed. Note.—For other cases, see Landlord and Tenant, Cent. Dig. §§ 441–443; Dec. Dig. § 125.*]

6. LANDLORD AND TENANT (§ 125*)—BREACH BY LANDLORD—DAMAGES.

A lessee's damages because the floors of the leased warehouse did not have the carrying capacity required by the lease was not limited to the amount which would have brought the building up to the requirements of the lease, where he had no right to make alterations in the building and the lessor, when called upon to make such alterations, instead of doing so, filed a suit for an injunction to prohibit the loading of the floors beyond their capacity.

[Ed. Note.—For other cases, see Landlord and Tenant, Cent. Dig. §§ 441–443; Dec. Dig. § 125.*]

7. LANDLORD AND TENANT (§ 125*)—BREACH BY LANDLORD—DAMAGES.

Where because the floors of a leased warehouse did not have the carrying capacity required by the lease, the lessee was compelled to move temporarily into another warehouse, goods in which were subject to a higher rate of insurance than in the leased building, and was therefore compelled to and did pay the difference in the insurance to a party whose goods he had contracted to store, he was entitled to recover this amount from the lessor.

[Ed. Note.—For other cases, see Landlord and Tenant, Cent. Dig. §§ 441–443; Dec. Dig. § 125.*]

8. LANDLORD AND TENANT (§ 125*)—BREACH BY LANDLORD—DAMAGES.

Where because of the defective condition of the floors of a leased warehouse the lessee incurred expense in labor and drayage in moving goods from a defective floor to another and in moving them into another warehouse, which would not have been incurred if the goods had been moved out in the regular course of business, he could recover such expense from the lessor.

[Ed. Note.—For other cases, see Landlord and Tenant, Cent. Dig. §§ 441–443; Dec. Dig. § 125.*]

9. LANDLORD AND TENANT (§ 125*)—BREACH BY LANDLORD—DAMAGES.

The lessee of a warehouse paid the government the premium for bonding the warehouse for one year. Thereafter, because of the defective condition of the floors, he discontinued using the warehouse for receiving goods on storage, but kept some goods therein for some time longer because of the necessity of obtaining the government's consent to their removal. Held, that he was entitled to recover from the lessor the proportionate part of the premium paid, but only from the time that the goods were removed from the warehouse, and not from the time that he discontinued receiving goods thereat.

[Ed. Note.—For other cases, see Landlord and Tenant, Cent. Dig. §§ 441–443; Dec. Dig. § 125.*]

10. LANDLORD AND TENANT (§ 125*)—BREACH BY LANDLORD—DAMAGES.

Where the lessee of a bonded warehouse, because of the defective condition of its floors, was compelled to obtain another warehouse in which to receive goods, but was unable for some time to obtain the government's consent to the removal of the goods from the first warehouse, during which time he was required by the government regulations to keep a storekeeper and an inspector at each warehouse, though he was doing no business and receiving no goods at the first warehouse, he was entitled to recover from the lessor the salaries of the extra employés which he was required to employ.

[Ed. Note.—For other cases, see Landlord and Tenant, Cent. Dig. §§ 441–443; Dec. Dig. § 125.*]

11. LANDLORD AND TENANT (§ 125*)—BREACH BY LANDLORD—DAMAGES.

Such lessee was entitled to recover from the lessor the amount uselessly paid to a telephone company while he was compelled to maintain both warehouses.

[Ed. Note.—For other cases, see Landlord and Tenant, Cent. Dig. §§ 441–443; Dec. Dig. § 125.*]

12. LANDLORD AND TENANT (§ 125*)—BREACH BY LANDLORD—DAMAGES.

Where the lessee of a warehouse because of the defective condition of its floors was compelled to move temporarily into another building until he secured a suitable building, he was entitled to recover of the lessor the expense of removing his goods from the temporary building to the new warehouse.

[Ed. Note.—For other cases, see Landlord and Tenant, Cent. Dig. §§ 441–443; Dec. Dig. § 125.*]

13. LANDLORD AND TENANT (§ 125*)—BREACH BY LANDLORD—DAMAGES.

The lessee of a warehouse who, because of the defective condition of its floors, was com-

pelled to move into a temporary warehouse, where the cost of insurance and the cost of labor in handling goods was greater than in the leased warehouse, was entitled to recover this difference from the lessor.

[Ed. Note.—For other cases, see Landlord and Tenant, Cent. Dig. §§ 441–443; Dec. Dig. § 125.*]

14. LANDLORD AND TENANT (§ 125*)—BREACH BY LANDLORD—DAMAGES.

The lessee of a warehouse who, because of the defective condition of its floors, sued for a cancellation of the lease and for damages was not entitled to recover the amount paid to experts for examining and reporting on the building with a view to supporting his side of the controversy, since such expenses are not recoverable in a suit for breach of contract, at least in the absence of malice or fraud.

[Ed. Note.—For other cases, see Landlord and Tenant, Cent. Dig. §§ 441–443; Dec. Dig. § 125.*]

On Application for Rehearing.

15. APPEAL AND ERROR (§ 1185*)—JUDGMENT —CORRECTION.

A clerical error in amount in the opinion and judgment of the Supreme Court would be corrected without granting a rehearing.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4636–4641; Dec. Dig. § 1185.*]

Appeal from Civil District Court, Parish of Orleans; T. C. W. Ellis, Judge.

Action by E. A. O'Rourke against the Fulton Bag & Cotton Mills. Judgment for plaintiff, and defendant appeals. Modified.

Gustave Lemle, of New Orleans, for appellant. Louis R. Hoover, of New Orleans, for appellee.

PROVOSTY, J. Plaintiff leased a warehouse building from defendant for the purpose, expressed in the lease, of conducting therein a public warehouse business. One of the beams supporting one of the floors of the warehouse having given away under the weight of the merchandise stored upon it, and other beams of other floors having shown signs of weakness by sagging, the plaintiff called upon the defendant to remedy the situation, and the defendant, after consulting with counsel, brought suit, alleging that the weight which the floors had been constructed to carry was 150 pounds to the square foot, with a factor of four, and enjoining plaintiff from loading them in excess of 200 pounds, and thereupon plaintiff brought the present suit, asking for the dissolution of the lease and for damages. The rent was payable monthly, and plaintiff had given notes for it. At the end of the month in which the suit was filed, the note then maturing not having been paid, the defendant company notified plaintiff that it exercised its right to cancel the lease for nonpayment of the rent, and accompanied the notice by the return to plaintiff of all the notes. Plaintiff accepted them, but with the qualification that he would consider the cancellation to be simply in compliance with the demand of the pending suit. The warehouse was a government bonded warehouse, out of which goods could not be removed without permission of the government; and several months elapsed after the cancellation of the lease before this permission could be obtained. The lease having thus been canceled, the suit remains one exclusively in damages.

[1] Paragraph 11 of Ordinance No. 6533, New Council Series, provides:

"Floors of all stores and warehouses to be calculated to carry a dead load of 250 pounds. All calculations for strength of floors of buildings to be with a factor of five."

By "a factor of five" is meant that the floor must be five times stronger than necessary to carry the ordinary weight it is designed to carry; so that, under this ordinance, a warehouse floor must be designed to sustain theoretically a load of five times 250, or 1,250 pounds to the square foot.

Plaintiff contends that, in view of this law regulating the construction of buildings, and intended for the safety and protection of life and property, there enters into every lease of a building for warehouse purposes in the city of New Orleans, if nothing be said as to what weight the floors of the

building can carry, a representation that the floors are calculated to carry a weight of 250 pounds with a factor of five, and that the person who accepts the lease has the right so to understand.

[2] Defendant contends that the cause of the termination of the lease was the failure of plaintiff to pay his rent, and that, such being the case, any losses which plaintiff may have sustained, as the result of his having had to vacate the building, and of his not having had the continued enjoyment of it, are attributable to his own fault, and do not give rise to any right of action.

This contention of defendant is but the presentation in another form of the main issue in the case, which is whether the floors of the building should have been capable of supporting 250 pounds to the square foot, with a factor of five, in order to come up to the requirements of the lease. For a lessee does not owe rent unless the leased premises are delivered to him, and if he does not owe rent, he cannot default upon the payment of rent; and the leased premises cannot be said to be delivered to him if, the lease calling for a building whose floors are capable of supporting a weight of 250 pounds, with a factor of five, to the square foot, there is delivered a building designed to support 150 pounds, with a factor of four, and the delivery is accompanied by an injunction forbidding the use of the building beyond this reduced weight. If, therefore, the plaintiff is well founded in his said contention as to the 250 pounds, he ceased to owe rent from the moment he notified defendant, by his suit in cancellation, that he was unwilling to accept the building as a compliance with the obligation under the lease to deliver a building designed to sustain a load of 250 pounds to the square foot, with a factor of five. This would be very clear if plaintiff had not gone into possession at all, but, discovering the inadequacy of the building, had refused to accept possession, and had brought suit instead for cancellation, and the suit had proved to be well founded. In such a case a contention on the part of the lessor that the juridical cause of the cancellation of the lease was not his own failure to deliver such a building as the lease called for, but was the failure of the lessee to have paid the rent at the end of the first month, would not have been entertained seriously. And it is plain that the fact of having gone into possession is legally insignificant, if done under the false impression that the building was such as was called for by the lease. A lessor who thus allows a lessee to go unwittingly into possession of an inadequate building does but superadd injury to his default.

We concur readily in the contention of plaintiff that, in view of the above transcribed building law of the city, requiring warehouse floors to be designed to carry 250 pounds to the square foot with a factor of five, he had a right to assume (in the absence of anything to the contrary either said or written) that this warehouse was of that character, and that the leasing of it by defendant for warehouse purposes amounted to a representation that it was such.

[3] Defendant says that the ordinance speaks only of "dead" load, and that the term "dead" load means the weight of the floors themselves before any load is put upon them, that the load put upon the floors after they are constructed is known as "live" load, and that, because of this defect in speaking of "dead" load when "live" load was meant, this ordinance became obsolete.

But this alleged defect could not have misled any one, since it is evident enough that the weight which the floors were to be "calculated to carry" was the weight to be on them when the space above them was full, not when empty; evidently, it would be useless, if not absurd, to provide by ordi-

133 La.—31

nance that floors of stores and warehouses should be strong enough to uphold their own weight, and even more so to require that they should be so constructed as to have a weight of their own of five times 250 pounds to the square foot. And, moreover, this ordinance was extant, both in the official publication of the city ordinances and in the handbook of the city engineer, as being the law regulating the construction of buildings. The contractor who constructed this warehouse admits, on cross-examination, that in 1910, when this warehouse was constructed, this ordinance was not obsolete. To the question: "Who made it obsolete?" he answered: "A committee of architects, contractors, and insurance men made a new Code on the 1st of January, 1911."

[4] Defendant also says that before entering into the lease the plaintiff visited and examined the warehouse, and that the beams supporting the floors were visible to him, and that it would have been a very easy matter for him to have calculated the carrying capacity of the floors. But, in so saying, defendant can hardly be serious. The carrying capacity of these floors was a matter for experts to determine and not for a nonexpert leasing the building for the purposes for which it had been recently constructed.

[5] Much evidence was taken on the question of whether or not plaintiff had loaded, beyond 250 pounds to the square foot, the beams that gave away. The materiality of this evidence we are unable to see. This evidence would be material, it seems to us, only if there were a demand that the plaintiff be required to pay for damages done to the building by overloading the floors, but there is no such demand. On this issue of whether the lease did or not call for a building capable of sustaining 250 pounds with a factor of five to the square foot, this evidence is clearly irrelevant; and on the issue of whether or not this building was of that character, it is of no use, since the defendant, far from pretending that it was, has alleged the contrary under oath in his petition for injunction.

[6] Defendant says that by an expenditure of $1,625 the building could have been brought up to the requirements of the lease, and that as this expenditure would not have been repairs, but reconstruction, the defendant was not obligated to make them, and that plaintiff should have made them, under his obligation to minimize the damages, and cannot recover a greater amount of damages than this $1,625.

Suffice it to say that plaintiff was utterly without right to make any alterations in defendant's building, and that defendant when called upon to make these alterations chose, instead, to file the injunction suit prohibiting the loading of the floors beyond 200 pounds.

Defendant cites cases where it has been held that a lessee cannot claim damages resulting from the want of such repairs as a lessee is authorized to make and pay for out of the rent. These cases are not in point, since the building was brand new, and did not need repairs.

Defendant having breached its contract, owes the damages which plaintiff has suffered as a consequence of such breach. The items are as follows:

[7] 1. Difference in insurance on Mente & Co.'s burlap, $258.48. The rate of insurance in defendant's building was 28 cents per hundred pounds. It was 75 cents in the building to which plaintiff had to move temporarily after defendant's breach of contract. Defendant had made a contract with Mente & Co. for the storage of this burlap, and hence had to make good to them this difference in the insurance, and he actually paid them that amount. He is entitled to recover it.

[8] 2. In labor and drayage in moving the

goods from the defective floor to another, and in moving the goods into another warehouse, plaintiff expended $573.80. He is entitled to this also. This expense would not have been incurred if the goods had been moved out in regular course of business.

[9] 3. Plaintiff paid the government $62.50 as premium for bonding the warehouse for one year, beginning September 1, 1910. He had the benefit of this bond only during the time he used the warehouse. He says that this was only until the 17th of November when he discontinued the use of the warehouse for receiving goods on storage. But we think that he must be held to have had the use of the building until the 1st of April, when he actually moved out of it. Hence, we think that he can claim reimbursement from defendant only for so much of this premium as was for that part of the year after the 1st of April, that is to say, for five months, or five-twelfths of this $52.08, or $21.70.

[10] 4. From the 17th of November when the defendant's building failed and plaintiff ceased receiving goods in storage in it, until April 1st, when plaintiff obtained permission from the government to move out, plaintiff was compelled by the government regulations to keep a storekeeper and an inspector at this warehouse, although he was no longer doing business, or receiving goods, in it; and, as he was compelled, under the same government rules, to keep a storekeeper and an inspector at the other warehouse to which he had transferred his business, he claims of defendant the salaries of these extra employés, and we think he is entitled to it. The amount is $704.97.

[11] 5. He is also entitled to the amount uselessly paid during the same time to the telephone company, $36.

[12] 6. Upon vacating defendant's building, plaintiff moved temporarily into another building, and, upon securing a suitable building, he moved into it. We think he is entitled to recover the expenses of this second removal, $810.35. As we understand the situation, he had no choice but to move into this temporary building. The expense of this second removal was therefore the direct result of defendant's breach of contract. Pothier, Obligations, Evans' Translation, par. 162, says:

"So if I let my house to a person in his quality as a tradesman, or for the purpose of being used as an inn, and the tenant is evicted, the damages and interests for which I am answerable to him will not be confined to the expense of removal and the rents, as in the former instance. The loss of custom, if he cannot meet with any other suitable house in the neighborhood, ought also, in some degree, to be taken in the account; for, having let my house for the purpose of a shop, or an inn, this kind of damage is one whereof the risk is foreseen, and to which I am considered as having tacitly submitted."

The defendant must be held to have contemplated at the time of entering into this lease that if, from any cause, the building failed to answer the purposes of the lease, plaintiff would have to move into another, and would have to move a second time if he found himself compelled to move into an unsuitable building until he could procure a suitable one.

[13] 7. Plaintiff received in the temporary warehouse 2,839 bales of burlap. Had he received them in the leased building the cost of insurance, together with the cost of labor in handling, would have been $1,583.32 less than it was in the temporary building. This loss resulted directly from his not having had the use of the leased building. The advantage of being able to store and handle the goods on storage at less expense was one of the advantages intended to be secured by the lease, and in consideration of which the amount of the rent was made larger. The amount of this loss is established with certainty. This differentiates the case from that of Redon v. Caffin, 11 La. Ann. 695, where a jeweler sued for the diminution of

the profits in his business, said to have resulted from the ineligibility of the building into which he had had to move, which amount it was impossible, in the nature of things, to establish with any degree of certainty. In the other case cited by defendant (Bonnecaze v. Beer, 37 La. Ann. 531) the lessor was held to have had the right to make the repairs and to have made them with the least possible injury to the lessee; there was therefore no right to claim damages; and, even if there had been, the profits in question, whereof the loss was claimed, were too uncertain, consisting, as they did, in the inconvenience and obstruction to a restaurant business.

[14] 8. Amount paid to experts for examining, and reporting on, the building with a verdict to supporting plaintiff's side of the controversy. Expenses of this kind fall in the same category as attorney's fees, which, as is well settled, are not recoverable in a suit for breach of contract—at least in the absence of malice or fraud.

9. Loss of business. This item is not proved with legal certainty.

The jury gave plaintiff judgment for $4,500. What particular items this amount was allowed for, we are not advised.

The judgment appealed from is reduced to $3,988.62, and as thus amended is affirmed. Plaintiff to pay costs of appeal.

### On Application for Rehearing.

PER CURIAM. [15] By a mere clerical error the item 10 in the opinion in this case was made to read $810.35 instead of $610.35. For correcting this error a rehearing is not necessary. A rehearing is therefore denied, but the judgment is corrected so as to read as follows:

"The judgment appealed from is reduced to $3,788.62, and as thus amended is affirmed. Plaintiff to pay costs of appeal."